# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **RUSSELL THOMPSON and DEMETRIUS MCCHESTER,** | ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) ) |
| **TEXAS DEPARTMENT OF PUBLIC SAFETY, TROOPER WILL RICHTER, TROOPER MARK STRANGE, and TROOPER JOHN DOE,** | ) ) ) ) ) |
| **Defendants.** | ) ) |

CASE NO. _____

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Russell Thompson and Demetrius McChester, by their attorney, complain of Defendants Texas Department of Public Safety, Trooper Will Richter, Trooper Mark Strange, and Trooper John Doe (collectively "Defendants"), and states as follows:

### JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of under the color of law of Plaintiffs' rights as secured by the United States Constitution.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one of the Defendants reside in this judicial district and because the events giving rise to the claims asserted occurred in this judicial district.

### PARTIES

4. Russell Thompson is an individual and resident of the State of Texas, residing in New Boston, Texas.

5. Demetrius McChester is an individual and resident of the State of Texas, residing in New Boston, Texas.

6. At the time of the incidents described herein Trooper Will Richter was a Texas Highway State Trooper employed by the Texas Department of Public Safety ("DPS"), who worked in Region 5, District A, Area 05, in or around Wichita County, Texas. Trooper Richter may be served at 5505 N. Central Freeway, Wichita Falls, Texas, 76306.

7. At the time of the incidents described herein Trooper Mark Strange was a Texas Highway State Trooper employed by the DPS, who worked in Region 5, District A, Area 05, in or around Wichita County, Texas. Trooper Strange may be served at 5505 N. Central Freeway, Wichita Falls, Texas, 76306.

8. At the time of the incidents described herein Trooper John Doe was a Texas Highway State Trooper employed by the DPS, who worked in Region 5, District A, Area 05, in or around Wichita County, Texas. Trooper John Doe may be served at 5505 N. Central Freeway, Wichita Falls, Texas, 76306.

9. The Texas Department of Public Safety is a State Agency organized under the laws of the State of Texas. It may be served through its Director, Steven C. McGraw, at 5805 N. Lamar, Austin, Texas 78752. The Texas Department of Public Safety is responsible for promulgating and implementing policies and procedures prohibiting the deprivation of the constitutional rights of the citizens of the State of Texas by its troopers, and to train and supervise its troopers in the implementation of those policies.

## FACTUAL ALLEGATIONS

10. This matter relates to an unlawful detention, search, and seizure of Russell

Thompson and Demetrius McChester in violation the Fourth Amendment to the United States Constitution, and the arrest of Russell Thompson and taking of personal property in violation Second and Fourteenth Amendments to the United States Constitution.

11. In the days before September 23, 2020, Thompson and McChester had driven from New Boston, Texas to visit family in Long Beach, California. On the return leg, they stopped in Las Vegas.

12. In the early morning hours of September 23, 2020, Thompson and McChester started the drive to New Boston, Texas. That morning was a chilly 65 degrees. Although Thompson drove most of the distance from Las Vegas to Texas, McChester was driving Thompson's 2019 Mercedes Benz CLS250 ("Mercedes") shortly before they were stopped by Trooper Will Richter.

13. At the time of the traffic stop, Trooper Richter was assigned to Region 5, District A, Area 05, in Wichita County.

14. After Trooper Richter noticed the Mercedes traveling on Highway 287, he followed the Mercedes for a short distance before activating his emergency lights to signal the driver of the Mercedes to pull over.

15. When Richter approached the Mercedes, he told McChester "the reason for the stop [was] because you were over the speed limit."

16. According to the warning citation Officer Richter issued, the reason for the stop was a "Moving Traffic Violation (TRC 545)." Richter never indicated to any person at the scene how fast the Mercedes was allegedly traveling at the time he noticed it was traveling over the speed limit.

17. Within 2 minutes of stopping the Mercedes, Richter determined that Thompson owned the Mercedes and that it was insured. He had obtained both McChester and Thompson's drivers' licenses and found nothing noteworthy about the identification cards, even though McChester's driver's license was expired.

18. Nonetheless, instead of returning to his patrol car to check the men's criminal backgrounds for any outstanding warrants, Richter asked that McChester exit the Mercedes.

19. While outside the Mercedes, Richter asked McChester multiple questions related to where they were traveling from, going to, and with whom they had associated during their trip.

20. During that questioning, McChester can be seen in Richter's body camera video standing with his arms folded as cars zoomed pass. McChester kept his arms folded for the entire questioning, and indeed for most of the hours' long detention.

21. McChester told Richter that: (1) they visited family and friends in Long Beach, California; (2) they stopped in Las Vegas, Nevada on the return leg; (3) Thompson was in the US Army for many years; (4) they lived in New Boston, Texas area all their lives, except for periods when Thompson was in the United States Army; and (5) they were returning home.

22. After more than 3 minutes questioning McChester, Richter briefly returned to his patrol car before returning to the Mercedes to question Thompson. Richter asked similar, but different questions of Thompson.

23. He asked whether they were traveling from Las Vegas, whether Thompson once lived in Las Vegas, and why Thompson stopped at the Veterans Hospital in Las Vegas.

24. Thompson then told Richter that: (1) they were traveling from Las Vegas; (2)

they were traveling to New Boston, where they currently lived; (3) he was in the United States Army for 20 years; (4) he retired from driving a commercial truck a few years back; and (4) he used to live in Georgia, where he was routinely contracted for commercial trucking jobs.

25. Richter returned to his patrol car before moments later finally revealing his real reason for the traffic stop—he wanted to search the Mercedes.

26. At this point, approximately 9 minutes and 27 seconds into traffic stop for traveling "over the speed limit," Richter: (1) had both occupants' drivers' license; (2) knew the Mercedes was insured; (3) knew the two men were related; (4) knew they had been in Long Beach and then Las Vegas; (5) knew Thompson was a US Army veteran; and (6) knew Thompson's driver's license was from Georgia.

27. Even though he had not made a criminal background check on either man, he asked to search the Mercedes. Thompson told him "no."

28. After having detained the occupants for more than 10 minutes, Richter's first action when back in his patrol car was to request a K-9 unit to conduct a free air sniff. This is despite never identifying how fast the Mercedes was allegedly traveling, nor running a criminal background check.

29. While in his patrol car, Richter told dispatch that he had stopped a Mercedes with two occupants. One occupant reported that they were coming from Long Beach, California and the other reported they were coming from Las Vegas, Nevada. He also told dispatch that the navigation in the Mercedes indicated the two were traveling to Memphis, Tennessee although they both reported they were going home to New Boston, Texas.

30. Armed with this information, Richter requested K-9 and cover units. He never

mentioned to dispatch the alleged reason for the traffic stop—speeding.

31. By now, the men had been detained for more than 20 minutes on a routine speeding stop, a majority of which McChester had spent outside the Mercedes in the chilly conditions.

32. After more than 20 minutes into the traffic stop, Richter returned to McChester, who had been standing outside the Mercedes in 65-degree weather. McChester's arms remained folded while Richter again questioned him about his occupation—totally unrelated to whether the Mercedes was speeding.

33. After spending approximately 2 additional minutes questioning McChester, Richter returned to Thompson to question him about his occupation. Now, Richter was attempting to make *small talk* while both men were outside the Mercedes.

34. He did not return to his stated reason for the traffic stop—speeding—nor inform the men that he had requested a K-9 unit. Moreover, Richter was still in possession of the men's drivers' licenses, the men remained outside the Mercedes, and Richter continued to question the men.

35. By now, the traffic stop had lasted more than 25 minutes. Given the extent of the stop, Thompson became notably irritated and declined to answer any additional questions. Finally, Richter indicated he had requested a K-9 to conduct a free air sniff. At this point, it was evident that neither man was free to go because Richter had retained their drivers' licenses, told then a K-9 Unit was on the way, both men were still outside the Mercedes, and Richter had yet to address the stated purpose of his traffic stop—speeding.

36. Indeed, after more than 30 minutes into the traffic stop, Richter asked McChester

whether he had any weapons on him. He told McChester he was detained and that he needed to search him for officer safety, notwithstanding that both men had been outside the Mercedes for more than 30 minutes, Richter felt comfortable making *small talk*, and after he had repeatedly turned his back on both Thompson and McChester, seemingly with no concern for his safety.

37. After approximately 40 minutes on the side of the highway, the K-9 Unit arrived. Richter asked both men to stand away from the Mercedes in between two patrol vehicles. While Richter and Trooper John Doe stood by McChester and Thompson, Trooper Mark Strange and his K-9 conducted an open-air sniff.

38. Before searching the Mercedes, Trooper Richter recited to Trooper Strange his alleged reasonable suspicion for detaining the men and requesting a K-9. After detaining the men for approximately 43 minutes by this time, he concluded that the men's stories were, confusingly, "similar but definitely very inconsistent."

39. After circling the Mercedes three times, the K-9 allegedly alerted to the front of Mercedes. According to Trooper Richter, the K-9 alerted to marijuana, cocaine, methamphetamine, or heroin.

40. While searching the trunk of the Mercedes, Trooper Strange located a loaded handgun in a storage compartment of the Mercedes. After checking for any criminal conduct connected with the handgun, Richter found none.

41. After finding the handgun, Trooper Richter returned to his patrol car where he spent a significant amount of time finally checking Thompson's criminal background, even though the men had been detained for over one hour.

42. His searched revealed Thompson's criminal history for crimes in Clark County,

Nevada, Bell County, Texas, and the State of Georgia.

43. While Thompson was charged with felonies, none of the charges resulted in felony convictions.

44. Notwithstanding finding no felony conviction, Richter arrested Thompson for being a felon in possession of a handgun.

45. Trooper Richter never checked McChester's criminal background.

46. After arresting Thompson, Trooper Richter released the Mercedes to McChester. Richter did not give McChester a speeding ticket nor a ticket for driving with an expired driver's license.

47. Richter also removed the bullets from the handgun and placed the bullets on the front seat of the Mercedes before permitting McChester to leave the scene with the Mercedes.

48. As part of his arrest, Trooper Richter subsequently drafted an affidavit to obtain a warrant for Thompson's arrest.

49. Upon information and belief, the magistrate judge believed Trooper Richter's affidavit was insufficient to show probable cause to search the Mercedes and to arrest Thompson. However, instead of accepting the lack of facts to show Thompson was committing a crime, Trooper Richter drafted a second version of his affidavit, which was used as the basis for Thompson's arrest.

50. This second version was acceptable to show probable cause.

51. Thompson spent the following days in jail. On the following Monday, September 26, 2020, Thompson's criminal-defense attorney demanded documents related to the traffic stop, search, seizure, and arrest. Thompson's attorney was provided with the second version of

the affidavit Richter drafted.

52. Before, however, Thompson's attorney could obtain any additional documents, the Wichita County Prosecutor's Office dismissed the charges, admitting that there was no underlying felony conviction on which the charge could stand.

53. The Wichita County Prosecutors Office did not turn over the first draft of Trooper Richter's probable cause affidavit.

54. As a result of Trooper Richter's conduct, Plaintiffs suffered a significant restriction on their freedom, violation of their Due Process Rights, actual damages, embarrassment, and emotional distress. Moreover, this violation has not only caused injury in the past, but also continues to serve as a reminder that although Mr. Thompson has put his life on the line for his country, he remains second class citizen.

## CAUSES OF ACTION

### Count 1—42 U.S.C. § 1983: Fourth Amendment

55. Plaintiffs incorporate the allegations in paragraphs 1-54 by reference.

56. Under the Fourth Amendment to the United States' Constitution, Plaintiffs have a right to free from unreasonable government searches and seizures.

57. Defendants DPS and Trooper Richter, deprived Plaintiffs of their Fourth Amendment right by not only utilizing the alleged speeding violation as a pretext to seize Plaintiffs, but by detaining Plaintiffs beyond the necessary time to effectuate and conclude the pretextual traffic stop.

58. Trooper Richter, as a uniformed State Trooper with a marked patrol car, conducted such unlawful seizure and detention under the color of Texas state law.

59. Trooper Richter's violation of Plaintiffs' Fourth Amendment Rights was the direct and proximate cause of the constitutional deprivation suffered by Plaintiffs.

### Count II—42: U.S.C. § 1983: Fourth Amendment

60. Plaintiffs incorporate the allegations in paragraphs 1-59 by reference.

61. Under the Fourth Amendment to the United States' Constitution, Thompson has a right to be free from unreasonable government searches and seizures.

62. Defendants deprived Thompson of his Fourth Amendment right by not only detaining Thompson beyond the necessary time to effectuate and conclude the pretextual traffic stop, but by also arresting Thompson without probable cause.

63. Trooper Richter, as a uniformed State Trooper with a marked patrol car, arrested Thompson under color of Texas state law.

64. At the time Trooper Richter arrested Thompson, Trooper Richter did not have probable cause to believe that Thompson had committed a crime. It is clearly established law that an officer may not arrest a citizen without first having probable cause to believe that the citizen committed or was in the process of committing a crime.

65. Defendants' wrongful arrest was the direct and proximate cause of the constitutional deprivation suffered by Thompson.

### Count III—42 U.S.C. § 1983—Second Amendment

66. Plaintiffs incorporate the allegations in paragraphs 1-65 by reference.

67. Under the Second Amendment to the United States Constitution, Thompson has a right to bear arms.

68. Defendants deprived Thompson of his Second Amendment right by arresting Thompson without probable cause to believe that Thompson had committed or was in the process of committing a crime.

69. Trooper Richter, as a uniformed State Trooper with a marked patrol car, arrested Thompson under color of Texas state law.

70. At the time Trooper Richter arrested Thompson, Trooper Richter did not have probable cause to believe that Thompson had committed a crime. It is clearly established law that a police officer may not arrest a citizen without first having probable cause to believe that the citizen committed or was in the process of committing a crime.

71. As a result of Defendants' wrongful arrest, Plaintiff was deprived his right to own and bear arms under the Second Amendment.

72. Defendants' wrongful arrest was the direct and proximate cause of the constitutional deprivation suffered by Thompson.

**Count IV—Failure to Intervene—Trooper Mark Strange and Trooper John Doe**

73. Plaintiffs incorporate the allegations in paragraphs 1-72 by reference.

74. Under the Second and Fourth Amendments to the United States' Constitution, Plaintiffs have a right to bear arms and a right to be free from unreasonable government searches and seizures.

75. At the time that Trooper John Doe and Trooper Mark Strange arrived on scene, they knew the facts on which Trooper Richter relied for detaining the Plaintiffs did rise to the level of reasonable suspicion or probable cause.

76. Because of their knowledge, Trooper Mark Strange and Trooper John Doe had a

duty to intervene to ensure the discontinuation of the violation of the Plaintiffs' Fourth and Second Amendment Rights.

77. At the time that Trooper Richter arrested Thompson, Trooper Strange and Trooper John Doe knew that Thompson's arrest was without probable cause. An arrest without probable cause is a violation of the Fourth Amendment.

78. At the time Trooper Richter arrested Thompson, Trooper Strange and Trooper John Doe knew that Thompson had a right to bear arms under the Second Amendment. Trooper Strange and Trooper John Doe also knew that Trooper Richter lacked probably cause to arrest Thompson.

79. Trooper Strange and Trooper John Doe had a duty to intervene to prevent the violation of Plaintiffs' constitutional rights but failed to do so.

80. As a result of Trooper Strange and Trooper John Doe's failure to intervene, Trooper Richter violated Plaintiffs' constitutional rights, which was the direct and proximate cause of the constitutional deprivation suffered by Plaintiffs.

### Count V—Failure to Train

81. Plaintiffs incorporates the allegations in paragraphs 1-80 by reference.

82. Defendant DPS has the responsibility to train, supervise, and control the conduct of its troopers.

83. Defendant DPS has an obligation to ensure that its troopers are adequately trained.

84. Defendant DPS failed to property train Troopers Richter, Strange, and John Doe in determining whether troopers have the requisite authority to detain citizens, including

Plaintiffs.

85. Moreover, DPS failed to adequately train Troopers Strange, Richter, and John Doe in the proper use of, access to, and reading of information retrieved through the Texas Crime Information Center ("TCIC") and the National Crime Information Center ("NCIC").

86. Defendant DPS's failure to train Troopers Strange, Richter, and John Doe in determining whether troopers have the requisite authority to detain citizens, including Plaintiffs, was the direct or proximate cause of Richter's deliberate violation of Plaintiffs' constitutional rights.

87. Defendant DPS's failure to train Troopers Strange, Richter, and John Doe in determining whether troopers have the requisite authority to detain citizens, including Plaintiffs, was the direct or proximate cause of Trooper Strange and Trooper John Does's failure to intervene when confronted with Richter's deliberate violation of Plaintiffs' constitutional rights.

88. Defendant DPS's failure to train Troopers Strange, Richter, and John Doe in the proper use of, access to, and reading of information retrieved through the TCIC and NCIC, was the direct or proximate cause of Troopers Strange, John Doe, and Richter's deliberate violation of Plaintiffs' constitutional rights.

89. Defendant DPS's failure to train Troopers Strange, Richter, and John Doe in determining whether troopers have the requisite authority to detain citizens, including Plaintiffs, amounts to deliberate indifference to the constitutional rights of the citizens of Texas, including Plaintiffs.

90. Defendant DPS's failure to train Troopers Strange, Richter, and John Doe in the proper use of, access to, and reading of information retrieved through the TCIC and NCIC

amounts to deliberate indifference to the constitutional rights of the citizens of Texas, including Plaintiffs.

91. As a result of Defendant DPS's failure to train Troopers Strange, Richter and John Doe, Troopers Strange, John Doe, and Richter violated Plaintiffs' constitutional rights, which was the direct and proximate cause of the constitutional deprivation suffered by Plaintiffs.

### Count VI—42 U.S.C. § 1983: Fourteenth Amendment

92. Plaintiffs incorporates the allegations in paragraphs 1-91 by reference.

93. The Fourteenth Amendment to the United States Constitution prohibits the states from depriving any person of life, liberty, or property without due process of law.

94. Thompson has a right to be free from government seizures and the taking of his personal property without due process of law.

95. Trooper Richter seized Plaintiffs within the meaning of the Fourth Amendment when he detained Plaintiffs, without reasonable suspicion or probable cause, for more time than necessary to complete the traffic stop for speeding.

96. Trooper Richter seized Thompson by arresting him in violation of the Due Process Clause of the Fourteenth Amendment when he arrested Thompson for being a felon in possession of weapon even though Trooper Richter lacked probable cause to believe that Thompson had committed a criminal offense.

97. Trooper Richter violated Thompson's Due Process Rights under the Fourteenth Amendment to the United States Constitution when he took possession of Thompson's handgun without probable cause to believe the handgun was involved in a crime.

98. Trooper Richter's wrongful conduct in violation of the Due Process Clause of

the Fourteenth Amendment was the direct and proximate cause of the deprivation of rights suffered by Plaintiffs.

## ATTORNEY'S FEES

99. It was necessary for Plaintiffs to hire the undersigned attorney to file this lawsuit based on the deprivation of Plaintiffs' constitutional rights. Accordingly, upon judgment in favor of Plaintiffs, Plaintiffs demand an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

100. Plaintiffs demand a jury trial.

## PRAYER

WHEREFORE, Plaintiffs asks this Court to enter a judgment in their favor and against Defendants Will Richter, Mark Strange, John Doe, and the Texas Department of Public Safety, jointly and severally, for compensatory damages in the amount of 3 million ($3,000,000) for the deprivation of Plaintiffs' constitutional rights, punitive damages to be determined by the jury, reasonable and necessary attorney's fees pursuant to 42 U.S.C. § 1988, pre-judgment interest, post-judgment interest, the costs incurred by Plaintiffs in the prosecution of this matter, and for all other relief to which the Court deems necessary and proper, including.

Respectfully submitted,

*/s/ Keron A. Wright*
**KERON A. WRIGHT**
State Bar No. 24075311
Keron.wright@wrightlegalpllc.com

**WRIGHT LEGAL SERVICES PLLC**
4925 Greenville Avenue, Suite 200
Dallas, Texas 75206
P: (214) 241-4407
F: (214) 845-7876

**ATTORNEY FOR PLAINTIFFS**